**UNITED STATES of America for the Use of JACKSON READY–MIX CONCRETE, a Corporation, Plaintiff,**

v.

**HYDE CONSTRUCTION COMPANY, Inc., United States Fidelity and Guaranty Company, National Surety Corporation, and the Aetna Casualty and Surety Corporation, Defendants.**

Civ. No. 5493.

United States District Court
N. D. Oklahoma.

Dec. 31, 1964.

Dyer, Powers & Gotcher, Tulsa, Okl., Robert C. Cannada, Jackson, Miss., for plaintiff.

Sanders, McElroy & Whitten, Tulsa, Okl., C. J. Watts, Oklahoma City, Okl., for defendant.

DAUGHERTY, District Judge.

This memorandum opinion deals with the counterclaim of the defendant, Hyde Construction Company, Inc., against the plaintiff, upon which the issues have been joined, evidence received by the Court, arguments heard, briefs submitted and suggested findings of fact and conclusions of law received by the Court.

The plaintiff's first cause of action has been previously dismissed. Judgment has heretofore been rendered by the Court in the amount of $14,533.20 on the plaintiff's second cause of action against the defendant, Hyde Construction Company, in accordance with the answer of said defendant, in which liability was

admitted, and the pretrial stipulation entered herein. Execution of this judgment has been stayed pending disposition of the counterclaim of the defendant, Hyde. A third party complaint has been filed herein which will await disposition pending the action of the Court covered by this memorandum.

In brief, the said counterclaim is based on the proposition that the defendant, Hyde Construction Company, Inc., has overpaid the plaintiff in connection with the furnishing of sand by the plaintiff to said defendant. Said defendant takes the position that its liability to the plaintiff for said sand is governed by a Purchase Order dated March 4, 1960 (signed by Traxler Materials, Inc., to whose rights plaintiff herein has succeeded), and calling for the delivery of sand in accordance with government specifications at the rate of 75¢ per ton. Said defendant states that it received a certain amount of sand which computed at the rate of 75¢ per ton obligated it to pay plaintiff the sum of $190,977.50, whereas in fact the said defendant has paid to the plaintiff the sum of $320,281.36. The difference, less the amount of the aforementioned judgment on the second cause of action, is the amount sought to be recovered by the said defendant on its counterclaim.

By way of defense to the counterclaim, the plaintiff says that said Purchase Order was never abided by or conformed to by the parties from the start and on March 8, 1961, the parties with legal consideration entered into a new agreement fixing the price of sand to be delivered by the plaintiff to the defendant and under said agreement the plaintiff was to be paid for the sand delivered under a joint venture arrangement basically at cost plus 10%. In effect, the plaintiff claims that said March 8, 1961, agreement legally superseded and replaced the earlier Purchase Order of March 4, 1960, and that the rights of the parties should be determined under the March 8, 1961, agreement. Plaintiff further points out that under date of November 18, 1961, by another agreement, the parties terminated the March 8, 1961, purchase agreement, specified the means of determining the amount due plaintiff thereunder and also provided for a delayed method of paying the amount due from the said defendant, Hyde, to the plaintiff.

The Purchase Order and all agreements involved are in evidence and they speak for themselves. The defendant, Hyde Construction Company, Inc., in effect claims that the plaintiff had threatened to shut down its sand plant and move off the location on the basis that it was losing money and thereby forced the defendant into entering into a new agreement; that in these circumstances the new agreement fails for a lack of consideration and the rights of the parties should be determined under the original Purchase Order which would result in the plaintiff owing the said defendant the amount sought under its counterclaim. The plaintiff, on the other hand, claims that the parties thereto had a bona fide dispute about operations under the Purchase Order and the plaintiff also undertook additional work not contemplated by the Purchase Order but included in the later agreement; that a valid consideration exists for the later agreement which is reflected by the evidence and the March 8, 1961, agreement itself, which spelled out the rights and obligations of the parties; that such March 8, 1961, agreement should be the instrument determining such rights, in which case the defendant must fail on its counterclaim against the plaintiff.

From a careful consideration of the evidence herein, the Court finds that by the original arrangement of the parties under the said Purchase Order of March 4, 1960, the plaintiff's plant was to be and in fact was located on the river bed at the dam site; that the defendant, Hyde, was to furnish trucks for hauling the sand from the plant to the dam, and the defendant Hyde was to furnish the necessary equipment to mix blow sand with the sand produced by the plaintiff from the river bed at the dam site and to do the necessary mixing.

Early in the operation the mixing process gave trouble. The Court believes that this was due to the nature of the sand at the dam site which was deposited by two converging rivers. It became necessary to move off the dam site and up one of the rivers some three or four miles. At this location the sand was satisfactory. Blending was also taken over by the plaintiff who used the equipment of the defendant, Hyde, for such purpose. More trucks were provided due to the increased haul from the new plant location to the dam. The price of the sand to the plaintiff under the new arrangement became an issue and was discussed by the parties. The defendant, Hyde, reported that it had to have the sand at any cost. Exactly what it would cost to produce the sand under the new arrangement was in dispute, the plaintiff estimating $1.25 per ton and the defendant believing that it could be produced for less than $1.00 per ton. There were some discussions about the Davis-Bacon Act which called for higher wages on the dam site than at the new location up stream and also about the plaintiff becoming a commercial producer at the new location. It appears to the Court that the Davis-Bacon Act wages were paid while on the dam site and wages were paid at the lower rate at the new location, and while efforts were made to sell some sand to other people the sand under Government specifications was not suitable and none, or practically none, was ever sold. The Court does not believe that the move up stream was made by the plaintiff to get a lower wage rate but rather was due to the mixing problem and the commercial production effort was merely desirable if possible but never developed.

It appears that at all times up to March, 1961, the difficulties encountered in mixing, hauling and the cost of production were recognized by both parties and the steps necessary to overcome the same were likewise recognized and agreed upon by both parties. On March 8, 1961, the parties reconciled the difficulties including the price dispute between them by entering into two agreements, one an agreement making the plaintiff and the defendant, Hyde, joint venturers in the production of sand, and the second, a purchase agreement between the defendant Hyde from the joint venture of the plaintiff and the defendant Hyde. Under this arrangement the plaintiff was assured of a 5% profit over and above cost of the sand and the defendant Hyde was assured of getting the sand and stood a chance of making some money under the joint venture, depending upon the actual cost of producing the same and hauling the same and by selling some sand commercially if possible. Also the blending process problem and method was settled. On November 18, 1961, the parties entered into three more agreements, one of which vacated the joint venture arrangement and provided that the parties would treat the same as if it had never occurred, the second agreement terminated the Purchase Order of sand entered into between the defendant Hyde and the plaintiff and the defendant Hyde as joint venturers, and the third agreement was a lease of plant equipment from plaintiff to the defendant Hyde so that the defendant Hyde could finish the production of needed sand. This second agreement also set out the means by which the amount of sand delivered at the agreed price would be calculated and based thereon the amount of money that would be due from the defendant Hyde to the plaintiff, and further provided for a delayed method under which the defendant Hyde would pay the plaintiff the amount of money it owed on the sand produced under the March 8, 1961, agreement. The Court further finds that in fact no sand was ever produced by the plaintiff for the defendant at the original plant located on the river bed on the dam site but that all sand was produced at the later up-stream location. Furthermore, the Court finds from the evidence that the plaintiff billed the defendant Hyde for sand at the new price, and that payments were made on these invoices from time to time without objection being made by the defendant Hyde. It does appear that three early $10,000.00 pay-

ments were made by the defendant Hyde to the plaintiff for sand but when these payments were made the price to be agreed upon was in dispute and these were merely lump sum payments subject to be treated in keeping with the actual price of the sand to be settled between the parties as soon as they could.

The case of Pittsburgh Testing Laboratory v. Farnsworth & Chambers Company (C.A.10), 251 F.2d 77, seems to have been concerned with the law believed applicable here. This case said:

> "It is the general rule, followed in Oklahoma where this contract was made and performed, that a promise to pay additional compensation for the doing of that which the promisee is already legally bound to do or perform, is insufficient consideration for a valid and enforceable contract." (Citing cases.)

> \*    \*    \*    \*    \*    \*

> "Another more widely accepted exception (to above general rule) might properly be called the 'unforseeable difficulties exception', under which the courts have recognized the equities of a promise for additional compensation based upon extraordinary and unforseeable difficulties in the performance of the subsisting contract. In these circumstances, the courts generally sustain the consideration for the new promise, based upon standards of honesty and fair dealing and affording adequate protection against unjust or coercive exactions." (Citing cases.)

> \*    \*    \*    \*    \*    \*

> "As far as we can determine, Oklahoma courts have not had occasion to embrace or reject what seems to us a salutary exception to the rule. But, there can be no doubt that the oral contract was made in the face of unforeseen and substantial difficulties—circumstances which were not within the contemplation of the parties when the original contract was made, and which were recognized when the subse-

quent oral contract was entered into. The performance of the contract took more than twice as long as the parties estimated. Pittsburgh's primary cost was expensive skilled labor, and the consideration for the contract was necessarily based upon the estimated time required for performance. We should be content to sustain the contract on the assumption that the Oklahoma courts would recognize and apply the so-called unforeseen difficulties exception in a case like ours. But the contract need not rest upon that ground alone. There can be no doubt that an agreement which compromises a bona fide dispute concerning duties and obligations under a subsisting contract, is supported by valid consideration and is enforceable." (Citing cases.)

39 Am.Jur. under Novation, beginning at page 255, provides:

> "A novation, then as understood in modern law, is generally defined as a mutual agreement among all parties concerned for the discharge of a valid existing obligation by the substitution of a new valid obligation on the part of the debtor. \*    \*    \*

> "A novation constitutes a new contractual relation and is based upon a new contract by all parties interested. The elements of such novation are essentially the same as in the original contract and include legal subject matter, competent parties, meeting of the minds, and sufficient consideration." (Page 256)
> \*    \*    \*

> "In order to constitute a valid contract of novation there must be a previous valid obligation, extinguished by a new valid contract, effected by substitution of parties or of undertaking, with the consent of all the parties, the debtor, the creditor, and the third party, if any, all intending such result. These requisites are frequently stated in the cases. There must also be a valu-

able consideration, although the discharge of the original contract generally constitutes the consideration for the newly created contract. If any of these essentials are wanting, there can be no novation." (Page 258) * * *

"A novation may result from the substitution of a new obligation or contract between the same parties, with intent to extinguish the old obligation or contract. Thus, where the parties to an existing agreement are unable to agree on the amount due thereunder, it is competent for them to adjust their differences by another contract, whereby the one obligates himself to pay to the other a fixed sum of money in settlement of mutual accounts, and the later contract, under the doctrine of novation, will be substituted for the earlier contract and the rights of the parties controlled by its terms, the earlier contract being thereby extinguished." (Page 260) * * *

"It is a well-settled principle that an essential element of every novation is a new contract to which all the parties concerned must agree, and in the absence of such agreement or consent a novation cannot be effected. In most jurisdictions assent to the terms of a novation need not be shown by express words, but may be implied from the facts and circumstances attending the transaction and conduct of the parties thereafter." (Page 262) * * * * * *

"The point in every case, then, is, did the parties intend by their arrangement to extinguish the old debt or obligation and rely entirely on the new, or did they intend to keep the old alive and merely accept the new as further security, and this question of intention must be decided from all the circumstances. The existence of such an intention may, of course, be found, even though there is nothing positive in the agreement. In other words, the intention to substitute one contract for another so as to constitute a novation need not be expressed, but may be inferred from the circumstances. The issue of novation presents questions of fact if there is any supporting evidence and the terms of the agreement are equivocal or uncertain." (Page 266) * *

"Contracts of novation are no different from other contracts in that to be valid and enforceable they must be based on a good and sufficient consideration. The consideration to support an agreement need not be pecuniary, or even beneficial to the person promising. If it be a loss or even an inconvenience to the promisee, the relinquishment of a right, as the discharge of a debt, or the postponement of a remedy, as the discontinuance of a suit, or a forbearance to sue, it is sufficient. * * * There is no form of words or writing necessary to give effect to these mutual undertakings. If the promise to pay is binding, the agreement to discharge is equally so; each is binding because the other is. The mutual agreement, then, of the parties furnishes the consideration, and as between the original debtor and his creditor, the discharge of the original debt or contract is a sufficient consideration." (Page 267) * * *

17 Am.Jur. 2d, beginning at page 927, provides:

"Any new agreement between the parties to an existing executory contract, made in substitution or modification of the elder compact and bilateral in benefit or burden, has, like the primary contract, a sufficient consideration in the mutual advantages or obligations which it confers or imposes. So, the mutual agreement of the parties to a bilateral executory contract, before a breach thereof, to abrogate and discharge it and to substitute in its stead a new contract conferring new

advantages or imposing new burdens on both constitutes a sufficient consideration to support the substituted contract. A compromise of the differences arising out of a contract and a mutual agreement to rescind such contract and to enter into a new one embodying the compromise constitute a sufficient consideration to support the new contract. * * * Each party must gain or lose something by the change. If the benefit or detriment is unilateral, a consideration is lacking, for it is a well-established legal principle that doing or undertaking to do only that which one is already under a legal obligation to do by his contract is no consideration for another's agreement to do what he is not already under a legal obligation to do. Accordingly, although some authorities state that the consideration for the original contract is sufficient to support a substituted contract and that new consideration is unnecessary, most authorities support the rule that a new consideration is essential to the substitution of one contract for another, unless there is an estoppel. An agreement in modification or substitution of a prior contract may be held binding if circumstances exist which give rise to an estoppel."

"The general rule that a promise to pay one for doing that which he was under a prior legal duty to do is not binding for want of consideration is viewed as subject to an exception where a plaintiff, having entered into a contract with the defendant, to do certain work, refuses to proceed with it, and the defendant, in order to secure to himself the actual performance of the work in place of a right to collect from the plaintiff, promises to pay him an additional amount.

"There is also a class of cases which supports the proposition that where a contract must be formed under burdensome conditions not anticipated or under unforeseen and substantial difficulties and the one seeking additional compensation is unable or unwilling to proceed, or refuses to do so, under the original contract, and the other party as a matter of fair dealing, or to get the work done, promises to pay him an additional or greater amount for doing it and he accordingly does it, the new promise is not without consideration." (Page 930) * * *

And 17 Am.Jur.2d, page 459, provides:

"As a rule, an extension of time for the performance of a contract or the payment of a debt constitutes a sufficient consideration for a contract."

The defendant, Hyde, urges on the Court the case of Robberson Steel Co. v. Harrell (C.A.10), 177 F.2d 12, but from a careful reading of this case the Court finds that the legal rules stated therein are not applicable under the facts of the case at bar. In the Robberson case, the Steel Company had not been paid on a previous job and attempted to force payment on the same by refusing to perform under a new and current job. There appeared to be no dispute about the subject matter of the current job. Some delays in shipment of steel were agreed upon and then the contract eventually was cancelled by Robberson. The court simply held under these circumstances that Robberson was liable for damages for breach of contract since Robberson had breached the contract in the first place and it could not escape damages it caused by non-delivery by asserting a later breach of the other party. This case simply does not fit the facts in this case. While the rules of law therein announced appear sound they should not be applied in this case, but rather it is felt that the Pittsburgh Testing Laboratory case is in point and should be followed by the Court.

The defendant, Hyde, has also asked the Court to apply the case of Smith v. Phillips Pipe Line Company (U.S.D.C. N.D.Okl.), 128 F.Supp. 61. This case

is authority for the fact that a party merely doing what he had previously promised to do cannot stand as a new and separate consideration for a subsequent agreement. In this case the alleged subsequent agreement was a promise that the performer would not lose any money by carrying out the contract in adverse weather. Since the performer was obligated to complete the project by a specified time without regard to weather conditions the court held that this alleged new agreement was unenforceable as not being based on a valid consideration. Again, the Court feels that this case and its facts and law do not apply to the facts and the rule of law therein announced should not be applied in this case.

■■ In the case at bar the Court concludes that the rights of the parties with reference to being paid for the sand delivered should be determined and controlled by the terms of the purchase agreement entered into between the parties on March 8, 1961, and then terminated by the agreement of the parties dated November 18, 1961. The rights and obligations of the parties with reference to the purchase and delivery of sand should not be controlled and determined by the original Purchase Order of March 4, 1960, for the reason that the same was superseded by the novation entered into by the parties on March 8, 1961, and confirmed and then terminated by the November 18, 1961, agreement.

The March 8, 1961, agreement is supported by a valid consideration existing between the parties for several reasons, (1) there was a bona fide dispute between the parties as to the amount to be paid for sand under the original purchase order operation, (2) the plaintiff undertook new and additional duties not required of it under the original purchase order, the same being the matter of blending the blow sand with the regular river bed sand, and (3) unforeseen and substantial difficulties—circumstances which were not within the contemplation of the parties when the original purchase order was made and which were recognized when the new agreement of March 8, 1961, was entered into —are present in this case inasmuch as the agreed upon original location of the plant was found to be unsatisfactory, a longer haul became necessary due to the moving of the plant up-stream, and difficulties were encountered in the blending process. It should be added that all of these problems were recognized by and between the parties and were embodied in the March 8, 1961, contract, and again recognized and affirmed by the November 18, 1961, agreement. The Court finds that the parties intended as shown by their acts and conduct, that the March 8, 1961, agreement would extinguish and replace completely the Purchase Order of March 4, 1960. The March 8, 1961, purchase agreement and the November 18, 1961, termination agreement support this finding. In addition, it could be said that the November 18, 1961, agreement wherein the means of determining the amount due were agreed upon and, in fact, subsequently accomplished, would constitute an account stated between the parties, and in such case the account stated should be enforced regarding the obligations of the party. See 1 Am.Jur.2d, Account stated, page 395 et seq. This would, of course, also prevent recovery under the original Purchase Order.

Accordingly, the position of the defendant, Hyde, cannot be sustained and the defendant, Hyde, should not be permitted to recover against plaintiff under and by virtue of the provisions of the original Purchase Order of March 4, 1960, inasmuch as the same was superseded by the March 18, 1961, agreement, which was then later confirmed by the November 18, 1961, agreement. Such being the case, the defendant, Hyde, has not sustained its burden to support the contention urged by its counterclaim and the same should be dismissed. Counsel for the plaintiff will prepare an appropriate judgment to this effect and present the same to the Court for signature and filing herein.